UNITED STATES BANKRUPTCY COURT       **NOT FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re                                             Chapter 11 Cases

ADELPHIA COMMUNICATIONS            Case No. 02-41729 (REG)
CORPORATION, et al.,

                                                (Jointly Administered)

                          Debtors.

-------------------------------------------------------------x

DEVON MOBILE COMMUNICATIONS         Adv. Pro. No. 04-03192
LIQUIDATING TRUST,

                         Plaintiffs,

      v.

ADELPHIA COMMUNICATIONS
CORPORATION, et al.,

                       Defendants.

-------------------------------------------------------------x

## MEMORANDUM DECISION ON DEVON MOBILE COMMUNICATIONS LIQUIDATING TRUST'S MOTION FOR SUMMARY JUDGMENT AND ADELPHIA COMMUNICATIONS CORPORATION'S MOTION FOR SUMMARY JUDGMENT

**A P P E A R A N C E S :**

Klehr, Harrison, Harvey, Branzburg
& Ellers, LLP
919 Market Street
Suite 1000
Wilmington, DE  19801
By:    Joanne B. Wills, Esq.
       Matthew J. Borger, Esq.
Counsel for Adelphia Communications Corp., et al.

Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building

1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391
By:    Richard H. Morse, Esq.
       Martin S. Lessner, Esq.
       Michael R. Nestor, Esq.

**CECELIA G. MORRIS, UNITED STATES BANKRUPTCY JUDGE:**

On December 9, 2005 Plaintiff Devon Mobile Communications Liquidating Trust

("Devon") filed its Motion for Summary Judgment, Memorandum of Law in Support of

Motion for Summary Judgment, Statement of Undisputed Fact and related Appendixes,

ECF Docket Nos. 96-100. Defendants Adelphia Communications Corporation, et al.

("Adelphia") also filed their Motion for Summary Judgment on December 9, 2005,

together with a Statement of Undisputed Fact and related Exhibits, ECF Docket Nos.

102-108; 115-118.  Adelphia filed Opposition to Devon's Summary Judgment Motion,

ECF Docket No. 112; likewise Devon filed Opposition to Adelphia's Summary Judgment

Motion, ECF Docket No. 113. Each party filed Responses; ECF Docket No. 120

(Devon), and ECF Docket No. 134 (Adelphia).  Upon the foregoing, and additional

papers submitted by the parties, and in consideration of the oral argument conducted on

February 15, 2006, the Court holds as follows:

Both parties are denied summary judgment on Count II, as the Court finds

material issues of fact exist as to whether the transfers made on August 31, 2001, October

26, 2001, November 23, 2001, December 7, 2001 and February 19, 2002 were returns of

capital or repayment of undocumented inter-company loans.  The Court also finds that a

material question of fact exists as to whether the transfer of the Florida License sale

proceeds were an improper return of capital, or fraudulent conveyances, and it is unclear

whether these funds were ultimately used to pay Devon Mobile Communications G.P.'s

ongoing operating liabilities, and thus whether Plaintiff received reasonably equivalent value for those transfers. A material issue remains as to whether Plaintiff was left undercapitalized by these transfers, as well.

Adelphia Communication Corporation is granted summary judgment on Count III of the Complaint, as the February 7, 2002 transfer of $22,100,000 was a transfer of funds initially provided by Defendants, and therefore did not diminish Plaintiff's assets and therefore, could not have been a fraudulent conveyance or have caused Plaintiff any contract damages.

Adelphia Communications Corporation is also granted summary judgment on Count IV, Deepening Insolvency, as Plaintiffs have failed to adequately allege that Adelphia Communications Corporation prolonged Plaintiff's life in breach of a separate duty owed to Plaintiff or any constituency thereof.

Finally, Adelphia Communications Corporation is granted summary judgment on Count V, the alter ego cause of action, on the grounds that Plaintiff does not have standing to bring such a claim.

Devon summary judgment motion is denied in its entirety.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984. Proceedings to determine, avoid, or recover preferences, fraudulent conveyances are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(F) and (H).

## UNDISPUTED BACKGROUND FACTS[1]

Devon Mobile Communications, L.P. ("Devon") was formed by Adelphia

Communications Corporation ("Adelphia") and Devon G.P. Inc., in 1995.  According to

the Certificate of Limited Partnership, Adelphia was named as a limited partner and

Devon G.P. Inc. was the general partner of Devon.  Lisa-Gaye Shearing Mead was the

president and sole shareholder of Devon G.P., Inc.  Adelphia owned 49.9% of Devon LP

and Devon GP held the remaining 50.1%.  This split in ownership established Devon as a

"designated entity" as a woman-owned business and as a small business.   The parties'

stated purpose in forming Devon was to take advantage of certain favorable minority and

women owned business incentives in procuring personal communication services (PCS)

licenses offered by the FCC to "designated entities."

In 1996 and 1997, Devon participated in certain PCS license auctions, some of

which were restricted to entities that qualified for designated entity status under the FCC

regulations.  During this time, Devon acquired approximately 30 PCS licenses covering

locations in Western New York, Western Pennsylvania, Virginia, Vermont/New

Hampshire and Florida.

According to Devon's Limited Partnership Agreement  (the "LPA"), a

Management Committee consisting of five members was to be established; three

members were to be designated by Devon G.P., and two members were to be designated

by Adelphia.  In practice, however, all decisions pertaining to the management of Devon

were made by Ms. Mead and James Rigas on a consensus basis.   The Devon

management team consisted of Ms. Mead; Marc LeClair, who held the position of Vice

---

[1] The following facts are gleaned from the parties' respective Statements of Undisputed Facts.

President of Broadband PCS Engineering until June 26, 1998; Lou Ebert, Vice President and General Manager of Devon; and Tom Benzee, Director of Devon's Business Operations.

Devon had two major sources of funding during its operating period: Adelphia, and the proceeds of the sale of two Florida PCS Licenses - the West Palm Beach License, sold in July, 2001 for approximately $36.5 million; and the Fort Pierce License, sold in October, 2001 for $13.5 million. Additionally, in late 2001 and early 2002, Devon had revenue from operations of $20,000 per month. The parties agree that Adelphia had no duty to fund Devon except for that explicitly set forth in the LPA, which included a requirement that Adelphia provide Devon with funding equaling ten percent of the cost of Devon's FCC licenses.[2] Nevertheless, Adelphia did provide Devon with millions in funding between 1995 and June, 2002.[3] These funds were used to pay Devon's vendors and other creditors, including Adelphia, and to build out the PCS network. The parties disagree as to whether vendor payments were consistently made on time; however, the parties do agree that substantially all of Devon's invoices, incurred prior to and including the month of April, 2002, were satisfied by contributions of funds made by Adelphia.[4]

In addition to providing virtually all of Devon's financing, Adelphia entered into certain services agreements with Devon. Adelphia and Adelphia Business Solutions employees provided Devon's treasury, payroll, accounts payable, capital authorization purchasing, cash management, customer care, retail outlet, human resources, engineering,

---

[2] *See* Plaintiff's Statement of Undisputed Fact, ¶ 9; Defendants' Statement of Undisputed Facts, ¶ 30; LPA Section 4.2.

[3] In 2002, Devon anticipated it would have capital expenditures in excess of $300 million to build out its PCS network. For 2001, Devon forecast costs of $150 million. *See* Plaintiff's Statement of Undisputed Facts, ¶¶ 77; 86.

[4] Although Devon's counsel stated at oral argument that he was not entirely sure as to whether all invoices were totally satisfied, he did admit that this fact was "very true, if not true." *See* Transcript of February 15, 2006 Hearing, p. 17, l. 11.

accounting, legal, regulatory processing, financial reporting, network monitoring,

marketing support, equipment sales, insurance and tax functions. *See* Plaintiff's

Statement of Undisputed Facts, ¶ 130; Defendants' Statement of Undisputed Facts, ¶ 51.

As stated, Adelphia provided Devon with certain cash management services pursuant to

the Services Agreement. The cash management system employed by Adelphia in

connection with the payment of Devon's operating costs changed over time and three

different processes were employed. *See* Defendants' Statement of Undisputed Facts, ¶¶

53-72. During the first process ("Process I"), Adelphia's accounts payable department

wrote checks from Devon's account in a local Pennsylvania bank, utilizing a stamp of Ms

Mead's signature. Process I was used from November 1995 through June 2001. This

process was time consuming and cumbersome, however, because the local bank was

outside Adelphia's First Union account system, and any electronic transfer of funds from

Adelphia to Devon's Pennsylvania account required approval from a signatory on

Adelphia's First Union account. At times, this process resulted in overdrafts and delays,

and a second process (Process II) was instituted to address these problems. Under

Process II, Devon opened an account within Adelphia's First Union account system. All

Devon's vendors were paid with checks cut from Adelphia's accounts payable

department using Adelphia's primary First Union checking account. If Devon did not

have enough money to fund its daily check run, Adelphia's Treasury Department first

transferred the funds from Adelphia's primary First Union Account (the "106 Account"),

to Devon's Account (the "2058 Account"), and then the funds were transferred back to

the 106 Account for the checks to be cut. Apparently, Process II was used from

December, 2000 through February, 2002. Thus, there was an approximate six month

overlap in which both Process I and Process II were employed, December, 2000 through

June, 2001.  In February, 2002 a third process was instituted, in which checks to Devon

vendors were cut from the Devon 2058 Account directly, and funds to cover those checks

were transferred from the Adelphia accounts.

The parties do not dispute that the following transfers were made from Devon to

Adelphia:

| | |
|---|---|
| January 27, 1997 | $  2,511,674.00[5] |
| August 3, 2001 | $  3,000,000.00 |
| August 10, 2001 | $33,000,000.00 |
| August 31, 2001 | $      975,000.00 |
| October 4, 2001 | $13,500,000.00 |
| October 4, 2001 | $      270,000.00 |
| October 26, 2001 | $        40,000.00 |
| November 23, 2001 | $        20,000.00 |
| December 7, 2001 | $      130,000.00 |
| February 7, 2002 | $22,100,000.00 |
| February 20, 2005 | $        95,000.00 |

The facts pertaining to these transfers are pertinent to the summary judgment

motion, and are essentially undisputed by the parties.  It is how the transfers are to be

characterized that remains at issue.

The Treasury Reconciliations:

The August 31, 2001 $975,000 transfer:  Cumulatively, between August 27, 2001

and August 29, 2001, the sum of $975,000 was transferred from the Adelphia 106

Account to the Devon 2058 Account, to fund Devon's daily check runs during those

periods.  The Devon check runs were paid from the Adelphia 106 account.  However,

according to Adelphia's Statement of Undisputed Facts, Adelphia also transferred

---

[5] Plaintiff agrees that the fraudulent conveyance claim as to this transfer is time barred by the Pennsylvania
statute of limitations, *see* Plaintiff's Brief in Opposition to the Adelphia Defendants' Motion for Summary
Judgment, at page 38.

7

$975,000 to Devon's Northwest Account to pay the same check runs. The double-funded money was returned to Adelphia pursuant to the cash management system, and despite Devon's request that the money be invested in Devon's name, because, according to Adelphia, the funds were advanced by Adelphia to begin with and should be refunded, *see* Adelphia's Statement of Undisputed Facts, at ¶ 137.

The October 26, 2001 $40,000 transfer: A deposit of unknown origin equaling $146,576.09 was made into the Devon 2058 Account on October 25, 2001. The Devon check run on October 26, 2001 only equaled $105,169.79; as Devon had sufficient funds in its account to meet the check run, no transfer was made from the Adelphia 106 Account on October 26, 2001. After the October 26, 2001 check run was paid, Devon had more than $40,000 left in the Devon 2058 Account. Adelphia caused $40,000 to be transferred to the Adelphia 106 Account on October 26, 2001.

The November 23, 2001 $20,000 transfer: Devon's November 23, 2001 check run totaled $562,571.27. Adelphia transferred $587,000.00 to the Devon 2058 Account, and a transfer of $562,571.27 was made on the same date to the Adelphia 106 Account. The remaining $20,000 was transferred to Adelphia on November 23, 2001.

The December 7, 2001 $130,000 transfer: On December 6, 2001, Devon's check run totaled $91,650.35. Adelphia transferred to Devon 2058 Account the sum of $90,000 on December 6, 2001. Devon transferred $91,650 to Adelphia on December 6, 2001 to cover Devon's check run. On December 6, 2001, a deposit in the amount of $189,989.22 was made into the Devon 2058 Account. At the end of the day on December 6, 2001, Devon's 2058 Account had a $190,351.71 balance. Devon's December 7, 2001 check run totaled $55,324.89, and this amount was transferred to Adelphia to cover that check

run.  Adelphia transferred $130,000 from Devon to Adelphia, leaving Devon with a day-end balance in the 2058 Account of $5,062.82.

The February 19, 2002 $95,000 transfer:  On that date, Adelphia made three transfers to Devon's 2058 Account:  $65,945.17; $78,000.00, and $150,000.00.  Also on February 19, 2002, two transfers were made from Devon's 2058 Account to the Adelphia 106 Account, $78,254.99 and $83,204.60, respectively.  Devon's day-end balance on February 19, 2001 in the 2058 Account was $136,237.14.  On February 20, 2006, Devon's check run was $40,780.81; no transfer was made to Devon from Adelphia on February 20, 2006, but $40,780.81 was transferred from the available funds in the 2058 Account to Adelphia's 106 Account to cover the check run.  On February 20, 2001, Adelphia transferred $95,000 to the Adelphia 106 Account from the Devon 2058 Account.

The Florida License Sale Proceeds:

The sale of the West Palm Beach license closed on July 2, 2001, generating proceeds of $36.5 million.  This sum was wired to Devon's Northwest Account on July 3, 2001.  On July 31, 2001, a $36,075,000.00 transfer was made from Devon's Northwest Account to Adelphia's 106 Account.  $36,000,000 was transferred on that same day to Devon's 2058 Account, and thence to a PNC Mutual Fund Account.  On August 3, 2001, $3,000,000 was transferred from the PNC Account to Devon's 2058 Account and then to the Adelphia 106 Account; on August 10, 2001, $33,003,743.96 was transferred from the PNC Account, to the Devon 2058 Account and then to the Adelphia 106 Account.  On August 10, 2001, $33,000,000 was transferred from the Devon 2058 Account to the Adelphia 106 Account.

The sale of the Fort Pierce License closed on October 4, 2001, generating sale proceeds of $13,500,000.  On that date, $13,500,000 was wire transferred to the Devon 2058 Account.  This amount was transferred from the Devon 2058 Account to the Adelphia 106 Account on October 4, 2001.

The February 7, 2002 Transfer:

The February 7, 2002 transfer:  Ms. Mead approved a $22,100,000.00 payment to Adelphia for various fees due and owing on February 5, 2002.  A check request was sent to Adelphia's accounts payable department, and on February 7, 2002, the accounts payable department issued a check in the amount of $22,100,000.00 made payable to Adelphia Communications Corporation from the Adelphia 106 Account.  Adelphia then transferred this exact sum of money from the Adelphia 106 Account to the Devon 2058 Account, and the money was subsequently retransferred from the Devon 2058 Account to the Adelphia 106 Account to cover the $22,100,000.00 check.

On May 21, 2002, Adelphia's management informed Devon that it would no longer be providing Devon with funding. Adelphia filed a voluntary bankruptcy petition on June 25, 2002.  Subsequent to the bankruptcy filing, Adelphia's Dececember 23, 2004 Form10-K stated that "[r]eaders should not rely on Adelphia's periodic and other reports filed prior to May 24, 2002."  *See* Plaintiff's Statement of Undisputed Facts, ¶ 162.  In the ensuing months, members of the Rigas family, including James Rigas, who participated in the decision making for Devon, were either convicted or plead guilty to various securities fraud charges.  *See* Plaintiff's Statement of Undisputed Facts, ¶¶ 18-19

Devon also filed for bankruptcy protection on August 19, 2002.  Devon Mobile Communications Liquidating Trust (the "Liquidating Trust") is the successor in interest

to Devon and was established pursuant to an October 1, 2003 Order (the "Devon

Confirmation Order") of the United States Bankruptcy Court for the District of Delaware

in In re Devon Mobile Communications, L.P., et al., Case No. 02-12431 (PJW)

confirming the First Amended Joint Plan of Liquidation of Devon Mobile

Communications, L.P. and the Devon Creditors Committee (the "Devon Plan").  By and

through the Devon Plan and the Devon Confirmation Order, all of Devon's assets,

including its causes of action, were transferred to the Liquidating Trust.

On June 21, 2004, the Liquidating Trust commenced this adversary proceeding by

filing its complaint (the "Complaint") alleging damages for certain preferential transfers,

fraudulent conveyances and breaches of contract, deepening insolvency and alter ego

liability.  The Complaint contains five causes of action.  Count I states that the

$22,151,821.32 transfer to Adelphia on February 7, 2002 was a preference.  Devon has

agreed that Adelphia is entitled to summary judgment on this count, see Plaintiff's Brief

in Opposition to the Adelphia Defendants' Motion for Summary Judgment, page 45.

Count II seeks recovery for fraudulent conveyances and breaches of the LPA.  According

to the fraudulent conveyance claim in Count II, Adelphia caused Devon to make certain

transfers to it,[6] which were improper returns of capital, for which Devon did not receive

reasonably equivalent value.   This Count also alleges that Devon was not generating

---

[6] The following transfers remain at issue in Count II:

| | |
|---|---|
| August 3, 2001 | $ 3,000,000.00 |
| August 10, 2001 | $33,000,000.00 |
| August 31, 2001 | $ 975,000.00 |
| October 4, 2001 | $13,500,000.00 |
| October 4, 2001 | $ 270,000.00 |
| October 26, 2001 | $ 40,000.00 |
| November 23, 2001 | $ 20,000.00 |
| December 7, 2001 | $ 130,000.00 |
| February 20, 2005 | $ 95,000.00 |

sufficient profit to sustain its operations and its remaining assets were unreasonably small capital for the business in which it was engaged. Furthermore, it is argued that Devon was insolvent at the time of the transfers and thus the transfers may be avoided as fraudulent conveyances. As to Devon's claims that the transfers were in breach of the LPA, Devon states that the transfers were made in violation of Sections 1.10, 4.3, 5.1, and 5.2 of the Devon LPA, as they were an improper return of capital contributions prohibited by the Agreement, made without regard to Devon's maintenance of reasonable cash reserves and the payment of Partnership expenses, and were not distributions made from available cash as none existed. Count III of the Complaint also alleges fraudulent conveyance and adds a claim for a breach of the Services Agreement.[7] According to the Complaint, Adelphia charged Devon excessive services fees which were not reasonably equivalent in value to the money paid by Devon, were made when Devon was unable to generate sufficient funds to sustain its operations, at a time when Devon's assets provided unreasonably small capital for the business in which it was engaged, while the value of Devon's liabilities exceeded the value of its assets, and were made while Devon was insolvent, and thus may be avoided pursuant to 11 U.S.C. §§544, 548. The alleged breach of the Service Agreements consists of Adelphia's failure to provide the services agreed to, including accounting and record keeping services. Count IV alleges Deepening Insolvency, as follows: Adelphia indicated that it would provide equity financing for Devon's activities until Devon was self-sufficient financially. In so doing, Adelphia knowingly misrepresented its financial circumstances with the intention that Devon would rely on those representations. Devon entered into contracts and incurred

---

[7] Count III concerns the February 7, 2002 transfer of $22,100,000.00.

obligations in reliance on Adelphia's representations, which Devon could not meet leading to Devon's bankruptcy filing. As a result of Adelphia's representations, Devon has been damaged by the incurrence of obligations it can't pay and expenses and fees incurred in connection with the bankruptcy filing, and the sale of its assets under less than favorable circumstances. The claims in Devon bankruptcy equal $182 million and the costs of the Devon bankruptcy equal $10 million. Devon is seeking to recover these amounts, plus punitive damages, from Adelphia.

Count V alleges that Devon was a mere instrumentality or Alter Ego of Adelphia. According to this count, Devon was established to take advantage of preferential rights to certain FCC licenses available to businesses owned by women or minorities. Adelphia controlled and operated Devon to such an extent that Devon was a mere alter ego or instrumentality of Adelphia. Adelphia was the sole source of capital for Devon and would receive all distributions and returns of capital for the foreseeable future pursuant to the LPA. Adelphia kept all corporate and operational records of Devon; corporate formalities and the separate existence of Devon were not observed, and Adelphia's structuring and operating of Devon involved improper or fraudulent actions. The Count VI Breach of Duty to Fund Operations has been voluntarily dismissed by Devon, *see* ECF Docket No. 94, "Stipulation of Dismissal as to Count VI of the Complaint."

The parties have filed cross-motions for summary judgment. Both parties seek summary judgment on Counts II, IV and V of the Complaint; Adelphia also seeks summary judgment on Count III of the Complaint and the indemnity counterclaims set forth *supra*.

13

In their answer, the Adelphia Defendants filed several counterclaims, and Adelphia seeks summary judgment on the following three counts: Count VII – Contractual Indemnity for the General Dynamics Claim pursuant to the LPA: indemnification is sought with respect to General Dynamics Government Systems Corp. ("General Dynamics") claim against Adelphia as guarantor of Devon's agreement with General Dynamics, which General Dynamics states was breached by Devon, in the sum of $34,908,731; Count VIII – Breach of Implied Indemnity Contract, in connection with General Dynamics demand for $34,908,731 based upon Devon's breach of a Master Services Agreement with General Dynamics; Adelphia also seeks reimbursement of attorney's fees, costs and expenses in connection with the defense of this claim; and Count IX – Equitable Indemnity, again with respect to Devon's alleged default under the Master Services Agreement with General Dynamics, and Adelphia's obligation as guarantor of that agreement. [8]

---

[8] The remaining counterclaims are:

   a.      Count I – Breach of Services Agreement, seeking $7,315,531 for breaches of payment obligations plus consequential, damages, interests and costs;

   b.      Count II – Unjust Enrichment – The Services Agreement, seeking $7,315,531 for services performed and goods provided for Devon's benefit;

   c.      Count III – Breach of Contract – Bridge Financing, Devon breached its obligations by failing to repay Adelphia for bridge financing in an amount not less than $56,277,605;

   d.      Count IV – Unjust Enrichment - Bridge Financing, Devon was unjustly enriched by retaining the benefits of the Bridge Financing;

   e.      Count V – Breach of Contract – Brokerage Fee Agreement, Devon failed to pay a 9% brokerage fee in the sum of $4,740,000 in connection with the purchase and sale of FCC Licenses in Fort Pierce and West Palm Beach, Florida;

   f.      Count VI – Unjust Enrichment – Brokerage Fee Agreement, Devon has been unjustly enriched by retaining the value of the brokerage services provided in connection with the purchase and sale of FCC Licenses in Fort Pierce and West Palm Beach, Florida;

   g.      Count X – Contribution, again with respect to Devon's alleged default under the Master Services Agreement with General Dynamics, and Adelphia's obligation as guarantor of that agreement

   h.      Count XI – Breach of Contract, ACC Telecommunications of VA, which provided telephone services to Devon, were not paid the sum of $1,701,818, and Adelphia is entitled to damages from the Liquidating Trust as successor in interest to Devon in this amount;

## DISCUSSION

### Standard on Cross Motions for Summary Judgment

"A grant of summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ⋯ must set forth specific facts showing that there is a genuine issue for trial." *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56, 59-60 (2d. Cir. 2004) (internal citation and quotation marks omitted).

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-8 (1986).

To defeat a motion for summary judgment, "the non-moving party must come forward with specific facts supported by sufficient concrete probative evidence to allow a rational trier of fact to find for her." *United States v. Ognoski*, 149 Fed. Appx. 24, 25

---

i.      Count XII – Unjust Enrichment, ACC Telecommunications of VA – Devon was unjustly enriched by retaining the value of the telephone services provided by ACC Telecommunication so VA.

(2d. Cir. 2005), *citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

A court may only grant summary judgment when "there is no genuine issue as to

any material fact and ⋯ the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). When ruling upon cross-motions for summary judgment, the court

must evaluate each motion separately and must draw all reasonable inferences against the

party whose motion is under consideration. *See Coach, Inc. v. Peters*, 386 F. Supp.2d

495, 497 (S.D.N.Y. 2005).

### Count II Fraudulent Conveyance Claim and Breach of Limited Partnership Agreement Contract

Both Devon and Adelphia have moved for Summary Judgment on Count II of the

Complaint.

Fraudulent Conveyance Claim

The following challenged transfers are alleged to be fraudulent conveyances:

August 3, 2001 - $2,850,000.00; August 10, 2001 - $32,785,000.00; August 30, 2001 –

$ 975,000.00; October 4, 2001 - $13,640,000.00; October 26, 2001 - $ 40,000.00;

November 23, 2001 - $ 20,000.00; December 7, 2001 - $ 130,000.00; February 20, 2002 -

$ 95,000.00 (collectively, "the Transfers").

These Transfers are also challenged as improper returns of capital made in breach

of the LPA Section 4.3, which states that "Except as otherwise provided in this

Agreement or by the Act, (i) no Partner shall have the right to withdraw or reduce its

Capital Contributions, or to demand and receive property, including cash, from the

Partnership in return for its Capital Contributions during the term of the Partnership…"

16

To prove a fraudulent conveyance, Devon must show that the Devon 1) received less than reasonably equivalent value in exchange for the transfers; **and** 2) was engaged in business or a transaction or was about to engage in a business or transaction for which any property remaining with Devon was an unreasonably small capital **or** (3) intended to incur, or believed that it would incur debts that would be beyond its ability to pay as such debts matured.  11 U.S.C. § 548(b)(i)&(ii)(II);(III).  The transfers made within one year of Devon's bankruptcy petition would be governed by 11 U.S.C. § 548.

In Devon's brief, Devon indicates that the fraudulent conveyance laws of New York[9] or Pennsylvania,[10] or both, would apply, to those transfers made more than one year prior to Devon's bankruptcy filing, pursuant to 11 U.S.C. § 544.  Devon also points out that the three fraudulent conveyance schemes (i.e. New York, Pennsylvania, and Title 11) contain substantially similar provisions such that an analysis under one would yield the same result as under any of the others. *See e.g. Satriale v. Key Bank USA (In re Burry)*, 309 B.R. 130, 137 (Bankr. E.D. Pa. 2004) (indicating that the 11 U.S.C. § 548 and 12 Pa. Cons. Stat. § 5104 contain essentially similar provisions).

> "Generally, a person challenging a transfer of the debtor's property as constructively fraudulent under New York law must show that it was made without fair consideration and…(2) the debtor was left with unreasonably small capital, § 274, or (3) the debtor intended or believed that it would incur debts beyond its ability to pay when the debts matured. § 275. In each case, the plaintiff must show that the debtor did not receive 'fair consideration.'… Under NYDCL § 272,
>
>> Fair consideration is given for property, or obligation,
>> a.  When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied....

---

[9] Devon cites to New York Debtor and Creditor Law §§ 274, 275.
[10] Devon cites to 12 Pa.Cons.Stat. § 5104 .

*Kenneth P. Silverman, as Chapter 7 Trustee of Nirvana Restaurant Inc. v. Paul's Landmark, Inc. (In re Nirvana Restaurant)*, 2006 WL 435821 * 3 (Bankr. S.D.N.Y. Feb. 24, 2006)(Bernstein, C.J.).

<u>The Treasury Reconciliations</u>: <u>Capital Contributions or Intercompany Loans</u>?

Devon points out that the Transfers were recorded on Devon's books as returns of capital. *See* Devon's Motion for Summary Judgment (hereinafter "Plaintiff's Motion"), citing to Mead Exhibit 81.  Because returns of capital are not made on account of antecedent debts, Devon argues, the payor (in this case Devon) did not receive anything in exchange for a return of capital to the investing party.   The parties agree that with the exception of the Florida License sale proceeds (the August 3, 2001, August 10, 2001 and October 4, 2001 transfers), all of the money used to fund Devon's operations originated from Adelphia (see Adelphia's Statement of Undisputed Facts ¶ 29; Plaintiff's Statement of Undisputed Facts, ¶ 170).  It is Devon's position that Adelphia's transfers of sums to Devon to cover payment of Devon's bills were advances of capital, and that the return of the excess advanced sums were a series of fraudulent conveyances.[11]    Since the original

_____

[11] The Court is uneasy with the somewhat conclusory allegation that the return of a capital contribution is a fraudulent conveyance, because it is not made on account of an antecedent debt.  *See* Devon's Motion for Summary Judgment, at p. 44:  "Devon did not receive reasonably equivalent value in exchange for the aforesaid returns of capital, because returns of capital are not made on account of antecedent debts, and the payor does not receive anything in return for a return of capital."  No citation to authority follows this broad statement.   Adelphia has pointed out in its motion papers that no case has been cited by Devon that allows a debtor to obtain affirmative recovery on a re-characterization argument.  When questioned at oral argument as to whether there was any authority for its position that re-characterization could support affirmative recovery for debtor on a fraudulent conveyance theory, Devon directed the Court to review the authorities cited in its briefs in support of summary judgment, but that counsel was not aware of law going either way.   *See* Tr. of February 15, 2006 hearing, at p. 11, l. 3-4.  Neither of the two cases primarily relied on by Devon, *In re AutoStyle Plastics*, 269 F.3d 726 (6th Cir. 2001) or *In re Cold Harbor Associates,* 204 B.R. 904 (E.D. Va. 1997), stand for the proposition that a debtor may achieve affirmative recovery for a fraudulent conveyance on a re-characterization argument.   On the other hand, Adelphia has not cited authority for the proposition that a re-characterization argument *cannot* be the basis for affirmative recovery.  The Court also notes that some of the advances were from funds that may have originated from deposits of unknown origin – a deposit of $142,500 made on October 25, 2001; and a deposit of $189,989.22 on December 6, 2001.  *See* Defendants' Statement of Undisputed Facts, Exhibit 29, at Wachovia 00011 and 00018.   Therefore, even if Devon is ultimately victorious on its argument that the funds were infusions of capital, and not loans, it is not clear that this characterization will result in a finding

transfers to Devon from Adelphia were allegedly infusions of capital, Devon maintains

that it did not receive reasonably equivalent value for the return transfers. This fact is in

dispute; it is Adelphia's argument that the initial transfers were not infusions of capital;

but rather, intercompany loans.  The parties do agree however that the substance of these

transactions was essentially "round-trip" and that the money, with the exception of the

Florida License Proceeds, was first transferred from Adelphia to Devon's account to

cover Devon's daily check run, and thence to Adelphia, who wrote checks to Devon's

vendors in accordance with Adelphia's obligations pursuant to the Services Agreement.

　　　　To reiterate, the sums at issue in this section deal with the return of overpayments

on sums advanced to cover the daily checks runs and not the actual sums that were

ultimately transferred to fund Devon's daily check runs. The transfers discussed in this

section include: $975,000 transferred on August 31, 2001; $40,000 transferred on

October 26, 2001; $20,000 transferred on November 23, 2001; $130,000 transferred on

December 7, 2001; and $95,000 transferred on February 19, 2002.  It was the practice of

Adelphia's treasury department to transfer a round figure to Devon, rather than the exact

amount of Devon's daily check run; the exact amount of the check run was subsequently

re-transferred to Adelphia to pay Devon's obligations, which at times left a balance in

Devon's 2058 Account.  If at the end of the day's check run a significant sum remained

in Devon's 5028 Account, Adelphia apparently swept those funds back to Adelphia's 106

Account.  *See* Defendants' Statement of Undisputed Facts, ¶67.  It is the Trust's position

that those excess sums should have remained with Devon to satisfy Devon's creditors

down the line, as these advances were capital contributions, and therefore should not

---

that the return of those funds was a fraudulent conveyance.  There remains the possibility, however, if the
funds were equity contributions that they were returned in breach of the LPA.

have been swept from the 2058 Account when they were not immediately used to fund

the daily check run.

Resolution of this aspect of Count II is dependent on the characterization of these

Transfers as returns of capital, a factually dependent analysis.    That is, if the Transfers

were returns of capital, they may have been transferred in breach of the LPA, and if they

were not repayments of loans, Devon may not have received reasonably equivalent value

for their return.  Devon points to several factors set forth in *In re AutoStyle Plastics*, 269

F.3d 726, 749-750 as an indication that the advances by Adelphia were capital

contributions:

> (1)  the names given to the instruments, if any, evidencing the
> indebtedness; (2) the presence or absence of a fixed maturity date and
> schedule of payments; (3) the presence or absence of a fixed rate of
> interest and interest payments; (4) the source of repayments; (5) the
> adequacy or inadequacy of capitalization; (6) the identity of interest
> between the creditor and the stockholder; (7) the security, if any, for the
> advances; (8) the corporation's ability to obtain financing from outside
> lending institutions; (9) the extent to which the advances were
> subordinated to the claims of outside creditors; (10) the extent to which
> the advances were used to acquire capital assets; and (11) the presence or
> absence of a sinking fund to provide repayments.

Applying these factors to the facts that exist herein, Devon emphasizes

that there were no notes evidencing the indebtedness between the limited partners,

which the *Autostyle* court found to be "a strong indication that the advances were

capital and not loans." *Id.* at 750.  Devon also maintains that there was no fixed

repayment schedule between Devon and Adelphia, and it is Devon's argument

that Devon was inadequately capitalized for its business purpose, i.e. to build out

PCS networks (Factors 2 and 5, respectively).  *Autostyle* holds that identity of

interest of stockholder and creditor is significant; that is, if the creditor advances

funds in proportion to its ownership interest in the in the business, then the advance is likely equity (implicating Factor 6). It is Devon's position that although Adelphia owned only 49.9% of Devon, Adelphia held almost the entire economic interest in Devon; because the LPA provided that if Devon was successful, Adelphia would receive most of the distributions of available cash, *see* Section 5.1 of the LPA. Devon seems to ask the Court to ignore the actual percentage interest held by Adelphia and look to Adelphia's economic interest in applying *Autostyle* Factor 6.

It is Adelphia's argument that Devon's actual financial statements booked all transfers as intercompany loans. *See* Exhibit 35 to Adelphia's Statement of Undisputed Facts. According to Adelphia, all ten of Devon's financial statements generated from the monthly periods between July 2001 and May 2002 reflect that these fundings (i.e. the original transfers) from Adelphia to Devon were either (1) intercompany debt in the nature of an account receivable owed from Devon to Adelphia or (2) denominated as "due from Adelphia" in the nature of an account payable from Adelphia to Devon (in the case of the Florida License Proceeds). The Adelphia Defendants cite the following factors as weighing against characterization of Adelphia's infusions into Devon as capital: they were booked as loans on Devon's financial statements, with the intercompany debt evidenced in a Devon account payable to Adelphia and not listed on the balance sheet as equity, whereas other fundings from Adelphia were listed as equity (Factor 1); they were not in proportion to Adelphia's ownership interest in Devon (Factor 6); and the intercompany debt could have been paid from a sale of Devon's assets, and

thus the repayment did not entirely depend upon the ultimate success of Devon (Factor 4).

Whether advances are capital contributions or loans is a question of fact.  *See In re SubMicron Systems Corp.*, 432 F.3d 448 (3rd Cir.  2006).  In determining the nature of the fundings and the return transfers, no one factor is determinative, *see Autostyle, supra*, at 750.   What the Court ultimately seeks to resolve in this context is how the parties intended the contributions to be characterized, a determination that doesn't always lend itself to a mechanical application of factors, *see e.g., Submicron Systems Corp*, *supra,* at 455-6, which states:

> In defining the recharacterization inquiry, courts have adopted a variety of multi-factor tests borrowed from non-bankruptcy caselaw. While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case.

*Both* parties had an interest in protecting Devon's designated entity status, which required Devon G.P. to remain the majority equity owner of Devon.  The parties' respective corporate financial records indicate at that Adelphia's infusions were given different characterizations by the parties in different contexts, i.e. as returns of capital in Devon's internal financial documents, *see* Mead Exhibit 81 to Plaintiff's Motion for Summary Judgment, but as accounts payable in Devon's public financial statements.  The Court believes that a question of fact exists as to whether the characterization of the money as "loans" may have been a byproduct of the need to protect Devon's designated entity status, which might have been

22

compromised had Adelphia held too great an ownership interest in Devon, while

the parties themselves actually intended the money to be treated as capital

infusions, to allow Adelphia to receive a return on its investment under the

provisions of the LPA. *See e.g.* Rigas Deposition, Exhibit to Plaintiff's Statement

of Undisputed Facts, p. 126[12]; Mead Deposition Transcript, Exhibit to Plaintiff's

Statement of Undisputed Facts, p. 133. [13]   Perhaps the parties were attempting to

preserve their ability to characterize the infusions as debt or equity, depending on

the circumstances, this would explain the divergence in record keeping – an

internal spreadsheet prepared by Devon in-house denominating the infusions as

capital contributions and public characterization in the financial statements as

debt.  Additionally, some *Autostyle* factors implicated in this case weigh in favor

of a characterization of the infusions as capital, such as the absence of notes,

whereas others seem to mitigate against characterization of the infusions as

equity; for instance, the infusion of funds in a grossly disproportionate interest to

Adelphia's ownership interest in Devon.  Thus a mechanistic application of the

factors would not lead to a definitive result on summary judgment in any event,

and a material issue of fact exists as to whether the infusions were capital

contributions or intercompany loans.  If they were capital infusions, the transfer

out was possibly a transfer of Devon's property, perhaps an improper return of

capital.  If they were loans, the transfers may have been a repayment – but there is

---

[12]     Q: Did you intend it to be a loan or a capital contribution?
A: I guess my understanding of monies that Adelphia put in [to Devon] was that they were put in as a debt type instrument…the structure that required (sic) by the FCC to be a designated entity (sic)…required…equity ownership by the designated entity.

[13]     A. Up to that point, my understanding of the partnership agreement and the discussions that we had had was that all of the money was going in as equity.

a regrettable lack of documentation as to repayment terms, etc. The Court cannot make the determination on the contradictory record before it. Summary judgment is therefore denied to both parties on the issue of whether the treasury reconciliation transfers were repayment of loans, returns of capital, or held by Adelphia as an accounts payable to Devon – the Court will try the issue of the parties' true intention with regard to the transfer of these funds.

Florida License Sale Proceeds:

Resolution of this issue is also dependent on the Court's determination that the transfer of the Florida License sale proceeds were returns of capital, and whether the Florida License sale proceeds were held by Adelphia and ultimately used to pay Devon's obligations.

Adelphia's Motion for Summary Judgment argues that the fraudulent conveyance claims, arising from the transfer of the Florida License sale proceeds totaling $49,275,000, must fail because Devon received reasonably equivalent value for these transfers. According to Adelphia, the funds transferred to Adelphia as part of the Florida License sales were actually used to pay bills approved by Devon pursuant to the intercompany cash management system, and thus, Devon received fair value for those funds. Devon argues in response that the transfers of the Florida License proceeds were done without Devon's knowledge, leaving Devon insolvent and without sufficient working capital.

The Transfers as Fraudulent Conveyances:

The question of whether or not reasonably equivalent value was provided in exchange for a transfer is a question of fact. *See Satriale v. Key Bank USA (In re Burry),*

24

309 B.R. 130, 137 (Bankr. E.D. Pa. 2004).  It is far from established that the direct

satisfaction of antecedent debt is the only way of ascertaining reasonably equivalent

value, however.   In determining value, the Court makes a two fold inquiry:  whether the

debtor received any value at all in exchange for the transfer; i.e. any realizable

commercial value as a result of the transaction, and whether that value was in fact

reasonably equivalent to the cash transferred by the debtor.  *See Burry, supra*, at 137,

citing *In re R.M.L., Inc.*, 92 F.3d 139 (3$^{d}$Cir. 1996).  If the transfers at issue were dollar

for dollar used to pay Devon's creditors, then Devon realized commercial value from the

transfers; that is, the satisfaction of its obligations to its vendors.  Additionally, there can

be no doubt that to the extent that the money was used to pay Devon's future bills Devon

received equal value for the transfers.  "If the indirect benefit constitutes reasonably

equivalent value to the debtor, a trustee cannot avoid the transfers as fraudulent." *Id.* at

138.

> The Transfers Left Devon with Unreasonably Small Capital:

Devon advances that the correct test for determining unreasonably small

capital is whether the transferor has been left with sufficient working capital. "In

order to determine the adequacy of capital, a court will look to such factors as the

company's debt to equity ratio, its historical capital cushion, and the need for

working capital in the specific industry at issue." *See MFS/Sun Life Trust-High

Yield Series v. Van Dusen Airport Services Co.,* 910 F. Supp. 913, 944 (S.D.N.Y.

2005).  Devon indicates in its summary judgment motion that a PCS network

build out requires hundreds of millions of dollars in capital. It is alleged that

Devon had unreasonably small capital or assets for the PCS industry, as $300

million was needed to build out its network and, in addition, Devon lacked the

resources to pay its debts as they came due.  In fact, Devon had monthly cash

flow of only approximately $20,000 in 2002, but forecast of $309 milllion in

capital expenditures, and thus, relied on Adelphia to pay all of its obligations.

Although Adelphia had no duty to fund Devon, apparently all of Devon's

obligations were nevertheless paid for by Adelphia up to and including the month

of April, 2002.

It is Adelphia's position that Devon was not undercapitalized or made insolvent

by the Florida License proceed transfers.  Rather, Adelphia maintains Debtor's cash flow

issues are not necessarily indicative of insolvency or undercapitalization, where, as here,

Debtor owned significant assets.  In fact, Devon owned valuable FCC licenses, and

Adelphia's expert Glen Pomerantz is prepared to testify that after the transfers in

question, Devon had the option of selling off some of its FCC licenses, and in that event

Devon would have had excess cash of $16.3 to $65.2 million (if Devon sold off its

Virginia Licenses), or from $108.7 to $163 million (if the remainder of the licenses were

sold off), which according to this expert, would have provided.   Devon counters that the

sale of the licenses would have taken too much time to have provided Devon with

working capital as needed on an ongoing basis, and would have defeated the purpose of

its existence – that is, without the licenses, there would be no PCS networks to build out,

and no necessity for Devon.  Of course, this argument ignores the fact that Devon did, in

fact, sell some licenses, the proceeds of which were ostensibly used to pay Devon's

operating expenses – the West Palm Beach and Ft. Pierce, Florida Licenses.  Although

the Court does not determine at this time whether the Florida License proceeds were

transferred to Adelphia as returns of capital or were held by Adelphia and ultimately used to pay Devon's expenses, the fact remains that some of the FCC licenses were sold, and Devon continued on; and if it turns out that the Florida License proceeds were in fact used to pay Devon's operating expenses, this fact will lend credence to Adelphia's argument that the sale of licenses could have funded Devon's operating expenses, and therefore, Devon was not necessarily undercapitalized or insolvent.[14]

This does not mean, however, that Adelphia will ultimately prevail on this issue. "Although a few courts have equated this [undercapitalization] with equitable insolvency, the better view is that unreasonably small capital denotes a financial condition short of equitable insolvency. The test is aimed at transferees that leave the transferor technically solvent but doomed to fail." *See MFS/Sun Life*, *supra*, at 944. It appears from this standard that even if Adelphia is correct in arguing that Devon was not actually technically insolvent, and thereby undercapitalized, there still may be an argument that Devon, although officially meeting its obligations, albeit only with Adelphia's constant assistance, of course, was doomed to fail. That is, it may be that once Adelphia no longer funded Devon, Devon's technical solvency (i.e. Adelphia paid Devon's bills as they came due) became moot, because the transfer of the Florida license proceeds, compounded with the termination of funding, ultimately meant that Devon could no longer function, thereby leading to the conclusion that Devon was left undercapitalized by the transfers. Adelphia's counter argument is that Devon could have sold some of its FCC licenses to raise needed capital, the legitimacy of which turns on expert testimony and this Court's assessment of the credibility of that witness. The Court thinks that summary judgment on

---

[14] *See* Transcript of Ms. Mead, Tab 6 to Plaintiff's Statement of Undisputed Facts, P. 142, l. 6-10: "[I]t became clear that these licenses had substantial value to them and perhaps if we amortized that value, we could use some of the funding to help us with our other capital requirements."

the issue of insolvency and adequate capitalization is inappropriate because the Court

needs to take evidence as to the specific capital requirements for this industry and as to

whether it was feasible for Devon to sell some of its licenses to raise working capital,

thereby defeating an undercapitalization argument.  Additionally, the Court needs to

ascertain whether the sale of additional licenses would have enabled Devon to build out is

network within the time frame required by the FCC; or whether Devon was doomed to

fail because no funds were available to Devon absent Adelphia's continued infusions.

Both parties are therefore denied summary judgment on the issue of whether the transfer

of the Florida License proceeds was a fraudulent conveyance for less than reasonably

equivalent value (which turns on whether the proceeds were used to pay Devon's bills

prospectively), which left Devon with unreasonably small capital (which turns on the

issue of whether Devon could have reasonably been expected to sell some PCS licenses

to raise capital).

Breach of Contract Claim

All of the disputed transfers at issue in Count II are also challenged as returns of capital in violation of the LPA. The LPA states that no partner shall have the right to withdraw or reduce capital contributions during the term of the Partnership. *See* Section 4.3 of the LPA. Alternatively, Devon argues that the transfers were distributions, and they violated the LPA because (1) distributions must be from Available Cash, after Ms. Mead made a determination as to an appropriate reserve and such determination was never made, for whatever reason and (2) all distributions were subject to payment of Partnership expenses. *See* Sections 5.1 and 5.2 of the LPA.

Adelphia argues that Devon's assertion that Adelphia violated Sections 4.3, 5.1 and 5.2 of the LPA because Adelphia's receipt of Devon cash was an impermissible return of capital must fail because the transfers were made as part of a proper cash management system, and never intended by the parties to be capital contributions. Adelphia states that the challenged transfers were made in connection with the payment of Devon's operating expenses and therefore, were for the ultimate benefit of Devon's creditors. Adelphia argues that the Florida transfers were posted on the intercompany account as a "Due From Adelphia" and used, ultimately, to pay Devon vendors and thus, Devon received reasonably equivalent value for the Florida License proceed transfers. A material question of fact exists as to whether Adelphia used the Florida License sale proceeds to pay Devon's liabilities: these transfers were allegedly used to fund checks issued to Devon's vendors, as purportedly evidenced by Exhibit 36 to Adelphia's Statement of Undisputed Facts. Devon has challenged this exhibit as unauthenticated; this exhibit is specific enough, containing names of vendors and payment amounts, to

raise an issue of material fact, at the least, with regard to the use of the Florida License

sale proceeds

The Court finds that summary judgment on Count II Breach of Contract Claim is

inappropriate as to the transfer of the Florida License Proceeds or the treasury

reconciliation transfers.  The Court cannot rule, as a matter of law, that the transfers were

improper returns of capital.


## Count III Fraudulent Conveyance and Breach of Services Agreement Claim

Adelphia has moved for Summary Judgment on Count III of the Complaint

regarding the February 7, 2002 $22,151,821.32 transfer, made as a payment to Adelphia

on account of the Services Agreement.  Adelphia maintains this transfer is not a

fraudulent conveyance because the Devon estate was not depleted by the transfer, as the

money was first transferred from Adelphia, to Devon, before being paid to Adelphia for

services rendered pursuant to the Services Agreement.  Adelphia alleges that a threshold

prerequisite for Devon's fraudulent conveyance claim is the requirement that the transfer

had to be a transfer of the property of Devon to Adelphia.  As the $22.1 million at issue

was first transferred by Adelphia to Devon and then back to Adelphia in payment for

services rendered in connection with the Services Agreement, it is Adelphia's argument

that Adelphia merely paid itself a wash transaction undertaken as a ministerial and

bookkeeping function.  According to Adelphia, Devon had a transitory interest at best in

this property.  *See Northen v. Centennial Healthcare Corp*, 2002 WL 31031631 (Bankr.

M.D. N.C. 2002).

Devon's argument is that the money, transferred initially from Adelphia to

Devon, and from thence back to Adelphia, became Devon's property during that

transition such that the re-transfer to Adelphia constituted a fraudulent conveyance. This

theory of recovery does not stand up to scrutiny. As Adelphia points out in its Summary

Judgment Motion, the relevant inquiry is whether the transfer had a "net effect on the

assets or liabilities of…Devon... Devon's estate was not diminished nor were Devon's

creditors harmed, by the transaction." In seeking to recover this transfer as a fraudulent

conveyance, Devon is essentially asking the Court to isolate the transfer from its context,

despite the undisputed fact that the money at issue originated with Adelphia and was

transferred only temporarily to Devon, either for accounting purposes or to protect

Devon's status as a designated entity, before being forwarded to Adelphia to pay it for

services fees. A similar situation existed in *Morse Operations, Inc. v. Goodway Graphics

of Mass., Inc. (In re Lease-A-Fleet, Inc.)*, 155 B.R. 666 (Bankr. E.D. Pa. 1993). In that

case, Debtor was the recipient of funds as an intermediary in a series of circular

transactions, which were undertaken by Debtor and its affiliates for record keeping

purposes and to avoid the payment of local "millage" taxes. *Id.* at 672. In that case,

Debtor received a transfer from Robins, an affiliated entity, and Debtor thereafter

transferred the funds to Goodways, a group of affiliated entities, who transferred the

money back to Robins, for payment of management fees and sales commissions. These

transfers occurred over a period of a few days. The bankruptcy court collapsed this series

of circular transactions,[15] holding that the transfers from the debtor could not be viewed

separately from the incoming transfers *to* the debtor from the third party, who was both

the source of the funds, and the ultimate recipient of the funds. The *Lease-A-Fleet* Court

---

[15] Collapsing transactions finds its "most frequent application to lenders who have financed leveraged buyouts of companies that have subsequently become insolvent" *see HBE Leasing Corp., infra,* at 635, but has also been applied in other contexts, *see Official Comm. of Unsecured Creditors of Sunbeam Corp. v. MorganStanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002).

held that "[w]hen each circle of cash is viewed as a single transaction, it is clear that the same monies simply passed through from Robins to the Debtor to the Goodways and back to Robins."  Similarly, when the Court examines the February 7, 2002 transfer, it becomes clear that Adelphia merely transferred money to Devon, and then back to Adelphia, in payment of services' fees; the money originated from Adelphia's account, passed through Devon's 2058 Account back to Adelphia's 106 Account.  The *Lease-A-Fleet* court pointed out that this view of the transactions was congruous with the purposes of § 548 of the Bankruptcy Code because no "…monies involved were…diverted from their availability to pay the Debtor's other creditors.  One of the primary purposes of § 548 of the Bankruptcy Code…is to prevent a debtor from transferring assets to certain specific creditors which should be available for all creditors.  In the instant matter, it is unclear what assets, if any, the Debtor actually transferred.  The evidence established that the *monies involved originated from Robins."  Id.* at 676-677 (emphasis added); *see also Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("In equity, substance will not give way to form, and technical considerations will not prevent substantial justice from being done. Thus, an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.").  Similarly, to the extent that the transfer involved here was a "round-trip transaction" of the type made in *Lease-A-Fleet*, and the funds transferred came first from Adelphia, were transferred on a pass-through basis to Devon, and were ultimately used to pay Devon's obligation under the Services Agreement, the transferred funds "were [not] diverted from their availability to pay Debtor's other creditors." *Lease-A-Fleet*, *supra*, at 676.  *See also HBE Leasing Corp. v. Frank,* 48 F.3d

32

623, 635 (2d Cir. 1995) (Multilateral transactions may under appropriate circumstances be collapsed and treated as a single transaction; a collapsed transaction cannot be a fraudulent conveyance if it does not adversely affect the debtor's ability to meet its obligations).

The Court agrees with Adelphia's position that the February 7, 2002 transfer did not diminish Debtor's estate, because the transfer originated from funds advanced by Adelphia to Devon, and were transferred thence from Devon to Adelphia, as part of an established cash management system.  There was no fraudulent conveyance because Adelphia was the source of the money used to make the transfer and Devon's assets were not diminished thereby.  That fact that the money was transferred to Devon on a transient basis before being transferred back to Adelphia does not make the conveyance fraudulent under the particular circumstances that exist herein.  *See Northen v. Centennial Healthcare Corp*, 2002 WL 31031631 (Bankr. M.D. N.C. 2002);  *Lease-A-Fleet, supra,* at 676.

It appears to the Court that the February 7, 2002 transfer was a  "round-trip transaction" and that if the necessity to protect the LP designated entity status did not exist, Adelphia would have directly paid Devon's bills, and "[s]uch direct payments [would]…merely substitute[] a new creditor for the old creditors.  Such transactions do not diminish a debtor's estate…." *Northen, supra,* at *7.  "Obviously, payments made with funds furnished to [debtor] by [service provider] could not constitute a fraudulent transfer of property of the debtors." *Id*.  To ignore the entire nature of this transaction would be the ultimate exercise in the elevation of form over substance.

Alternatively, Devon has argued that Adelphia overcharged Devon for services provided under the Services Agreement, that the alleged overcharging constituted a breach of the Services Agreement and that the alleged breach entitles Devon to recoup the $22.1 million less the "actual" value of the services provided by Adelphia (which Devon denominates as a quasi- *quantum meruit* argument). Adelphia argues that regardless of the value of the services provided, Devon was not harmed because there was no monetary loss to Devon.

The Court agrees that Devon cannot show damages resulting from the alleged Breach of Contract Claim relating to the Services Agreement, because the money came first from Adelphia, and its transfer did not diminish Devon's value. The transfer did not divert funds that would have otherwise been available to Devon's creditors; *see Lease-A-Fleet, supra* at 676-77; because the money originated with Adelphia, and was transferred with the specific purpose of making payment on the Services Agreement between the parties. That is to say, even if Devon was overcharged, no damages were caused by the breach because Devon did not make payment to Adelphia from funds available to Devon's other creditors – Adelphia initially transferred the money to Devon for the specific purpose of paying fees owed pursuant to the Services Agreement, and this money was subsequently transferred to Adelphia in payment of those services. Had a lower amount been sought for services, Adelphia would have merely transferred the lesser sum – Devon would have been none the richer, or poorer for that matter, in that circumstance, and cannot seek affirmative recovery on this basis here. As discussed *supra,* to the extent that the money came initially from Adelphia in the first place, and was transferred to Devon for the sole purpose of paying the service fees, the re-transfer was not a fraudulent

34

conveyance because no assets of Devon were depleted.  Thus Adelphia is entitled to
summary judgment on Count III.

### Count IV Deepening Insolvency

Both Devon and Adelphia seek Summary Judgment on this Cause of Action.

Deepening insolvency "refers to the fraudulent prolongation of a corporation's
life beyond insolvency, resulting in damage to the corporation caused by the increased
debt."  *See Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp., I)*, 333 B.R. 506, 516
(Bankr. D.C. 2005), citing *Schact v.* Brown, 711 F.2d 1343, 1350 (7th Cir. 1983), s*ee also
Seitz v. Detweiler, Hershey and Assoc. (In re CITX Corp., Inc.)*, 2005 WL 1388963 (E.D.
Pa. June 7, 2005); *Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.)*, 377 F.
Supp.2d 390, 417-18 (S.D.N.Y. 2005).  One seeking to recover for deepening insolvency
must show that "the defendant prolonged the company's life **in breach of** a separate
duty, **or** committed an actionable tort that contributed to the continued operation of a
corporation or its increased debt."  *In re Global Services Group, LLC*, 316 B.R. 451, 458
(Bankr. S.D.N.Y. 2004) (emphasis supplied).

Devon alleges that the separate duty breached by Adelphia was the public filing
of materially false statements that presented Adelphia to the public as a strong,
financially healthy company.  Adelphia's public filings are said to be grossly defective
such that Adelphia's Form 10-k filed on December 23, 2004 provides that "[r]eaders
should not rely on Adelphia's periodic and other reports filed prior to May 24, 2002."
Ms. Mead has testified that, hypothetically, if she had known that Adelphia would be
unable to continue financing, and she thought she had no alternative source of financing,
she would not have incurred the debt.  Furthermore, it is alleged that Rigas knew of

Devon's virtual total reliance on Adelphia which led Devon to incur obligations.

Devon's reliance is said by Devon to have been reasonable in light of Adelphia's actions

in establishing Devon, and investing tens of millions of dollars in it, ceasing to make

investments only when it was on the verge of a bankruptcy filing, and guaranteeing

obligations under the contract between Devon and General Dynamics, among other

actions set forth in Devon's submissions.

On the other hand, Adelphia questions Devon's reliance on Adelphia's alleged

breach of its duty to file accurate financial statements as an appropriate predicate for its

deepening insolvency cause of action. According to Adelphia, a cause of action

predicated upon a corporation's public financial statements originates from the 1934 Act,

found at 15 U.S.C. § 78m. As the disclosure requirements found in the 1934 Act are

intended to protect investors and enable them to make considered investment decisions,

Adelphia maintains the duty owed to file accurate financial statements was not owed to

Devon or Devon's creditors, but to Adelphia's shareholders and potential investors and

therefore cannot support a deepening insolvency claim asserted by Devon.

Since all the debt at issue in this complaint was substantially incurred after April,

2002, when Mead knew that Adelphia was in trouble and there was reason to believe that

the financial statements were inaccurate, it is argued that deepening insolvency is not

appropriate. Adelphia states that it cannot be said that Devon continued to incur debt

based upon a false reliance on Adelphia's financial situation if Ms. Mead knew that

Adelphia was in trouble at the time all of the debt at issue in this action was incurred.

*See* Adelphia's Opposition to Devon's Summary Judgment Motion, at p. 39 ("There is no

evidence that any vendors were not paid or that any vendors stopped work because of

non-payment.  In fact, all vendors were paid current through April, 2002, just after

Adelphia announced its fraud investigation.").  *See also,* Plaintiff's Statement of

Undisputed Facts, ¶ 80 ("On May 21, 2002, Adelphia Management informed Devon that

it would no longer be providing Devon with funding.").

   Adelphia argues that the issue of proximate cause also exists; if no one at Devon

actually relied on Adelphia's inaccurate financial statements when incurring the debt at

issue in this adversary proceeding, then Devon's insolvency was not proximately caused

by Adelphia's inaccurate public filings.  Adelphia posits that Ms. Mead's hypothetical

response to Devon's deposition question is a far cry from stating affirmatively that she

would not have incurred the debt had she actually known of Adelphia's true financial

condition, or for that matter that she actually relied on such false information.

Additionally, Adelphia argues that Devon does not have standing to bring this claim that

requires particularized proof from Devon's third-party creditors, and Devon has not

demonstrated that Adelphia wrongfully benefited from the alleged deepening insolvency.

   The *Global Services* case points out that "prolonging an insolvent corporation's

life, without more, will not result in liability" pursuant to a deepening insolvency theory.

*See In re Global Services Group, LLC*, 316 B.R. 451, 458 (Bankr. S.D.N.Y. 2004).

Instead, it must be shown that the debtor's corporate life was prolonged "in breach of a

separate duty or [in commission of] an actionable tort that contributed to the continued

operation of a corporation and its increased debt."  *Id*.  Devon maintains that it need not

show that an actionable tort was committed because it has shown that Adelphia breached

its duty to refrain from making materially false filings with the Securities and Exchange

Commission.  Devon points out that it must show that Defendants' "breach of duty"

"contributed" to the incurrence of additional debt, and that it was Adelphia's reputation as a financially strong company, ultimately, that induced Devon to incur additional debt in misplaced reliance on that reputation.  *See* Plaintiff's Brief in Opposition to Adelphia's Summary Judgment, p. 28-29.  Indeed, in response to the Court's inquiry at oral argument as to whether a duty owed to Devon was breached, counsel for Devon stated that the failure to file accurate public financial statements was "…not a breach directly to Devon.  I don't think it has to be.  I think the essence of the *Global Services Group* decision is that for there to be a deepening insolvency claim, the conduct of the defendant which prolongs the defendant's life must be wrongful conduct."  *See* Transcript of February 15, 2006 hearing, p. 70-71, line 24-25, 2-6.  The appropriate showing to be made, according to Devon, is that a separate duty was breached, albeit not a duty necessarily owed to Devon, which "contributed," even tangentially, to the prolongation of Debtor's life and the deepening of Devon's insolvency.

The Court thinks that this construction of the Global Services' holding constitutes an unwarranted extension of the law with regard to deepening insolvency, expanding the doctrine's reach to the mere prolongation of corporate life, because Adelphia's alleged breach of duty had no legal connection to Devon's incurrence of additional debt.   The *Global Services* case requires one of two permutations be shown: either (1) the defendant prolonged the company's life in breach of a separate duty or (2) committed an actionable tort that contributed to the continued operation of the corporation and its increased debt. *See id.* at 459.  Devon seeks to compress the deepening insolvency standard set forth in *Global Services*, positing that the breach of a duty need not necessarily be owed to the insolvent entity or its constituencies, so long as it contributed to the continued operation

of the corporate entity and the incurrence of further debt.  This interpretation of

deepening insolvency misinterprets the standard set forth in *Global Services*, in essence

compressing the standard to include any prolongation where wrongdoing has occurred,

regardless of whether that wrongdoing was in any way connected to a deliberate attempt

to prolong the entity's life.  It is not alleged that Adelphia did anything wrongful in a

deliberate attempt to prolong Devon's life.  There can be no doubt that wrongdoing

occurred in Adelphia's operations, but the wrongdoing alluded to cannot be the umbrella

under which every party injured by the bankruptcy filing huddles, seeking recompense.

The wrongdoing must be related to the injury through breach of a duty owed to the

injured party.  No breach of a duty owed to Devon or any constituency thereof has been

claimed.  The Court now finds that there must be a breach of a duty *owed to the company*

(or similar constituency with legal standing) for a claim for deepening insolvency to lie.

*See Alberts v. Tuft, et al. (In re Greater Southeast Community Hospital Corp.)*, 333 B.R.

506, 516 (Bankr. D.C. 2005) ("[T]he *sina qua non* of the [deepening insolvency] concept

is that the defendant breached some pre-existing duty of care *owed to the corporation* in

deepening its insolvency.") (emphasis supplied).

   That being established, the Court can find no duty owed by Adelphia to Devon in

filing it public financial statements.  "Duty" is defined by Black's Law Dictionary as "[a]

legal obligation that is owed or due another, and that needs to be satisfied; an obligation

for which somebody else has a corresponding right."  Black's Law Dictionary 543 (8th

ed. 2004).  The constituency having a corresponding right to Adelphia's duty to file

accurate financial statements was not Devon and its creditors; as Adelphia cogently

argues in its brief, the disclosure requirement found in the 1934 Act was intended to

protect investors and enable them to make intelligent investment decisions.

      "Section 10(b) and Rule 10b-5 were designed by Congress to protect the purity of

the process of buying and selling securities and to insure that investors will receive full

disclosure of the information they need if they are intelligently to make significant

investment decisions." *See In re Penn Central Securities Litigation*, 357 F.Supp. 869,

876 (E.D. Pa. 1973).  Regardless of Devon's reliance on Adelphia's financial statements

*vel non*, Devon had no corresponding right to rely on those statements for its future

security. The parties' agree that Adelphia did not have a duty to fund Devon's operations

beyond that contained in the LPA.  See ECF Docket No. 94, Stipulation to Discontinue

Count VI of the Complaint, dismissing Devon's Breach of Duty to Fund Operations

Claim.  Nor is it alleged that Adelphia encouraged Devon to continue incurring debt with

false promises of further funding; rather, the allegation is merely that Devon would not

have incurred debts had it known Adelphia's true financial situation.  Starting in May,

2002, Devon was affirmatively informed that Adelphia could no longer fund Devon's

operations; it has been established that a large amount of the debt for which recovery is

sought was incurred after this date.  Active misrepresentation is not alleged here, and

Devon's reliance on Adelphia's reputation, however un-justified, cannot be the basis for a

claim for deepening insolvency, because Adelphia did not owe a duty to inform Devon of

its financial condition, or to continue funding Devon.

      Indeed, in order for fraudulently inaccurate financial statements to be the

predicate for a deepening insolvency theory, they would have had to have been filed in an

attempt to prolong the life of Devon itself.  The concept behind a deepening insolvency

theory is that at some point, the corporate insiders have an obligation to "stop the bleeding," and not to incur further debt, *see Schact, supra,* at 1350; *see also Global Services Group, supra,* at 460.  If the corporate officers and directors know that the corporation can no longer operate as a "wealth creating" entity, *see Global Services, supra*, at 460, but continue the corporate enterprise in breach of a separate duty (i.e. the duty owed to creditors when in the vicinity of insolvency) or in commission of an actionable wrong (i.e. looting corporate assets for insiders' benefit), and accomplished the continued operations by filing false operating statements, for instance, then deepening insolvency may have been appropriate.  But there is no allegation that Adelphia filed the allegedly inaccurate statements in an attempt to prolong Devon's life, in breach of a duty to Devon or its creditors; indeed, Adelphia had no duty to Devon or Devon's creditors with regard to the filing of its financial statements; it was a limited partner with no obligation to fund Devon and no liability for partnership debt. (For further treatment of Adelphia's liability as a limited partner for Devon's debts, see the discussion *infra* regarding Devon's alter ego argument). Nor is it alleged that Devon's financial statements were negligently or fraudulently prepared at Adelphia's instigation or behest.

There is also an allegation made that the terms of LPA made it difficult, if not impossible, for Devon to seek financing from sources other than Adelphia.  Although this may have been a bad deal for Devon, and a good deal for Adelphia, it is not a tort.  *See Global Services*, at 459 (bank's loan to a corporation that bank knew could not repay the debt was bad business, but not a tort).  There is no attempt by Devon to make out a cause of action for tortious interference with prospective business advantage, for instance, as a predicate for the deepening insolvency cause of action.  Rather, what appear to be

allegations of a business deal between two parties with uneven bargaining power are being made, an all too familiar refrain in the bankruptcy arena. Courts are correctly reluctant to level the playing field among parties of disparate positions in the open market place. The Court will not do so here under the auspices of a deepening insolvency claim. Devon's existence was not prolonged in breach of a separate duty owed to Devon by Adelphia, and therefore, Adelphia is granted summary judgment as to Count IV.

## Count V Alter Ego/Veil Piercing Claim

Again, Devon and Adelphia have both filed motions seeking Summary Judgment on this issue.

The parties' agree that Delaware law applies to the veil piercing action. The Liquidating Trust argues that it is entitled to Summary Judgment on its claim that Adelphia, as the alter ego of Devon, is liable to the Trust for the debts the Trust is unable to pay. Under Delaware law, a court may pierce the corporate veil of a company "where there is fraud or where it is in fact a mere instrumentality or alter ego of its owner…" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2nd Cir. 1995). "To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an "overall element of injustice or unfairness is present." *Id*. "Among the factors to be considered in determining whether a subsidiary and parent operate as a 'single economic entity' are: (1)Whether the corporation was adequately capitalized for the corporate undertaking; (2)whether the corporation was solvent; (3)whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (4)whether the dominant shareholder siphoned corporate funds; and (5) whether, in

general, the corporation simply functioned as a facade for the dominant shareholder." *Id*.

In its briefs filed in support of its summary judgment motion, Devon sets forth a myriad

of circumstances which Devon maintains show that Adelphia and Devon operated as a

"single economic entity."

Adelphia counters that it can only be held liable for a debt of Devon if the narrow

statutory tests of Delaware Limited Partnership Act ("DLPA") found at Del. Code Ann.

tit. 6 § 17-303 are met.   Adelphia also maintains that its participation in Devon's affairs

falls within the parameters of the safe harbor provisions of the DLPA.   Finally, Adelphia

maintains that a limited partner can only be held liable to persons who transact business

with the limited partnership believing that the limited partner was a general partner, and

thus, Devon lacks standing under DLPA to bring an action seeking to hold the limited

partner liable.  Adelphia claims they are entitled to Summary Judgment on Devon's Alter

Ego Claim because the doctrine of veil piercing cannot be employed to impose liability

on Adelphia for the debts of Devon; the Liquidating Trust lacks standing to assert a claim

on behalf of all creditors to hold Adelphia liable because Del. Code. Ann. tit. 6 § 303(a)

is claimant specific; and the material facts show that Adelphia did not exercise complete

domination and control over Devon and any exercise of control by Adelphia did not

cause fraud or injustice.

The Court holds that the veil piercing doctrine can only be applied to the limited

partnership with regard to the "control" element found in Section 17-303(a), and then

only by third parties who dealt with the limited partnership believing that the limited

partner was in fact a de facto general partner of the limited partnership.  Thus, Devon

does not have standing to make this argument; and the Court does not reach the issue of

whether Adelphia and Devon operated as a single economic entity such that corporate

veil piercing principles are implicated.  (Neither is the Court convinced, however, that a

party doing business with a limited partnership in Delaware is automatically on notice of

the status of its partners by virtue of the filing of the limited partnership certificate with

the secretary of state, as Adelphia contends.).

The Court agrees that Devon does not have standing to make this veil piercing

argument under the DLPA and related jurisprudence, as the Court has not been made

aware of any authority that has imposed liability for partnerhip debt on a limited partner

outside the parameters set forth in the DLPA.  The clear language of § 17-303 indicates

that limited partner liability for the obligations of the limited partnership may only be

established within the explicit parameters of the statute. Del. Code Ann. title 6, § 17-

303(a) states in pertinent part:

> A limited partner is not liable for the obligations of a limited partnership
> unless he or she is also a general partner or, in addition to the exercise of
> the rights and powers of a limited partner, he or she participates in the
> control of the business. However, if the limited partner does participate in
> the control of the business, **he or she is liable only to persons who**
> **transact business with the limited partnership reasonably believing**,
> based upon the limited partner's conduct, that the limited partner is a
> general partner.

(Emphasis supplied).

The only on point case that the Court could find, which was cited by the Adelphia

Defendants in their Summary Judgment Motion, is *Skidmore Energy, Inc. v. KPMG*,

2004 WL 3019097 (N.D. Tex. Dec. 28, 2004).  In that case, the District Court determined

that "an alter ego theory of liability is inapplicable…to a limited liability partnership

organized under Delaware law…" *id*. at *5, ostensibly because such liability is

44

unnecessary, as the general partner remains liable for all partnership debts.  This Court

will go further to state that alter ego liability may not be imposed by the general partner

of a limited partnership within the framework of § 17-303(a), and that the provisions of

this statute cannot be circumvented by the general partner by making a showing that the

established legal authority relating to corporate veil piercing, if applied, would be

implicated.  The Court is not persuaded by the reverse veil piercing case cited by Devon,

because the facts are inapposite – the *C.F. Trust* court held the limited partnership liable

for the debts of the limited partner to the extent of the limited partner's interest in the

partnership assets; and not *vice versa*.  *See C.F. Trust, Inc. v. First Flight Ltd.*

*Partnership*, 580 S.E.2d 806 (Va. 2003).  In the case of reverse veil piercing, a partner is

attempting to use the limited partnership form to shield personal assets from the creditors

of the individual partner, and not seeking to shield the limited partner from liability for

the debts of the limited partnership, which is what Devon seeks to do in this matter.  For a

discussion of reverse veil piercing, *see generally* Larry E. Ribstein, *Reverse Limited*

*Liability and the Design of Business Associations*, 30 DEL. J. CORP. L. 199 (2005).

Although a veil piercing analogy may be used to establish whether a limited

partner has exercised "control" within the meaning Del. Code. Ann. tit. 6 § 17-303(a), as

this Court ruled with regard to the discovery disputes in this case, the language of the

statute is explicit in providing that the only party that may assert such a claim would be

an actual creditor who engaged in business with the limited partnership believing that

Adelphia was a de facto general partner of Devon.

The Court nevertheless rejects Adelphia's argument that the filing of a certificate

of limited partnership in the Office of the Secretary of State of Delaware, which would

45

include the name of limited partnership and its general partner, would automatically

preclude any liability being imposed on the limited partner for acting as general partner

because all parties are put on constructive notice of the limited partners status by the

public filing.  This argument renders the language of § 17-303(a) a nullity, and also

ignores the fact that parties may well do business with a limited partnership believing that

a limited partner was a de facto general partner, even while knowing full well the status

of the limited partner as a matter of record.  This was the injustice that § 17-303(a) was

designed to prevent, and this Court has already indicated that Adelphia's acts in holding

out Devon as its newest "family member," and marketing Devon's services as "Adelphia

Mobile" while providing Devon with 100% of its financial support, may have given

creditors just that impression.

The DLPA provides for liability only if the third party reasonably believes, "based

upon the limited partner's conduct, that the limited partner is a general partner."   This

could mean that the third party may recover if the third party reasonably believes that the

limited partner is acting as a general partner, even if the third party knew that the limited

partner was not formally a general partner.   This interpretation seems logical because the

third party can always check the filed certificate for the names of the general partners,

and would indeed always be on at least constructive notice of the existence of the limited

partnership agreement.  It is difficult to imagine how a third party would ever

"reasonably" mistake the formal identity of the general partners.  *See* Larry E. Ribstein,

*Unlimited Contracting in Delaware Limited Partnership and its Implications for*

*Corporate Law*, 16 J. CORP. L. 299, 308 foonote 54 (Winter 1991).  Because Devon

does not ultimately have standing to make the alter ego argument, however, the Court need not determine this issue.

The definitive question on this issue for the Court on these summary judgment motions is whether Devon can circumvent the provision of the DLPA to hold a limited partner liable on an alter ego theory. Devon has misconstrued this Court's March, 2005 ruling, artfully redacting the actual ruling in its summary judgment briefs to make it appear as if the Court held that Devon could resort to veil piercing precedent as if the limited partnership were a corporation. What the Court actually ruled was that Devon would be entitled to show control within the meaning of Section 303(a), and in so doing could rely on the well-settled precedent of corporate veil piercing. The Court quoted the following authority for that proposition:

"Although Section 303(b) [of the Revised Uniform Limited Partnership Act] specifies certain circumstances that do not constitute participation in control, section 303 does not affirmatively state what does constitute control. Thus, in the absence of statutory guidance, the courts are largely free to draw upon the much older and well-established body of corporate veil-piercing decisions…"

30 AM. JUR. PROOF OF FACTS 3d 249, Piercing the Limited Partner Veil (August 2004).

The Court allowed Devon to obtain discovery in this action that might show that Adelphia exercised control within the meaning of § 17-303(a), but did not rule that Devon could circumvent the entire statute and attempt to hold Adelphia liable as if the limited partnership did not exist. Such a ruling would be *jus dare*, and not *jus dicere*, and tantamount to judicial legislation. The Court cannot overthrow the statutory protections that the Delaware state legislature has set in place for limited partners. Nor will the Court ignore the parties' status as limited partners at Devon's request, when Devon is asking the Court within the ambit of the same action to enforce provisions of the LPA pertaining

to returns of capital.   Doubtless the Liquidating Trust would prefer that the Court pierce

the partnership veil rather than enforce the LPA, but such is not to be.

As to Devon's standing, then, the Court considers it to be clear from the language

of the statute that the limited partner may only be held liable by those  "persons who

transact business with the limited partnership reasonably believing, based upon the

limited partner's conduct, that the limited partner is a general partner."  § 17-303(a).

 "Whether an action accrues to a creditor individually, such that a creditor has standing,
or generally, such that a trustee has standing, requires the court to look to the injury for
which relief is sought and consider whether it is peculiar and personal to the creditor or
general and common to the ... creditors."

*See PHP Liquidating, LLC v. Robbins*, 291 B.R. 603, 610 (D. Del. 2003).

The injury asserted in § 17-303(a), transacting business reasonably believing that

the limited partner was a general partner, is specific, as the belief as to the limited

partner's status is subjective, and cannot be asserted as a general claim on behalf of all

creditors, as some creditors may have held different opinions on this score.  The Trust

does not have standing to pierce the limited partnership veil.

Because Devon does not have standing to assert this veil piercing claim, the Court

does not reach whether Adelphia improperly controlled Devon within the meaning of

DLPA.  Adelphia is granted summary judgment on Devon's alter ego cause of action,

Count V of the Complaint.

## INDEMNIFICATION WITH RESPECT TO THE GUARANTY CLAIM BY GENERAL DYNAMICS

Adelphia seeks summary judgment on the issue of whether it is entitled to

indemnification from Devon on a $35 million guaranty claim.  Devon is the principal

obligor under an agreement with General Dynamics, and Adelphia was a signatory solely

as a guarantor of Devon's obligations.  The proof of claim filed by General Dynamics

Claim is in the Adelphia Bankruptcy is approximately $35 million.

Adelphia alleges that the fact that General Dynamics has not been paid on its

claim does not preclude a "declaration" of its right to indemnity.  Indemnity is predicated

on three grounds - contractual, implied and equitable – as follows:

Contractual – pursuant to Section 15.7 of the Devon L.P. Agreement, Adelphia is

entitled to express indemnity on all obligations owed by virtue of its status as a limited

partner of Devon.

Implied – as a matter of Pennsylvania State law, Devon has an implied legal duty,

arising out of the General Dynamics Agreement, to indemnify Adelphia for the General

Dynamics Claim.  This reimbursement from the principal, Devon, may be used as a setoff

of any damages Devon may recover from Adelphia.

Equitable – as a matter of law and equity, Adelphia is entitled to recovery, even if

that recovery is realized as either a setoff of obligations it may be adjudged to have to

Devon or an allowed claim in Devon's chapter 11 case.

Devon argues that the counterclaim for indemnification is not ripe for

adjudication because no payment has been made on the guaranty, rendering Adelphia's

liability as merely contingent, and judicial economy requires that indemnification be

decided at the same time as equitable subordination.  Furthermore, Devon points out that

Adelphia has objected to the General Dynamics claim, which may be disallowed and if

so, no right to indemnity will exist.  According to Devon, what Adelphia seems to be

seeking is a declaratory judgment, which should have been sought in its answer as a

counterclaim.

Also, the Trust has raised equitable subordination as a defense to Adelphia's claims,

which, if decided in Devon's favor, would subordinate all Adelphia's claims to those of

Devon's other creditors, making indemnification illusory.

Devon also argues Adelphia has no right to contractual indemnity from Devon.

The Services Agreement with General Dynamics does not contain any right to

indemnification within its four corners, and the LPA limits indemnification of the limited

partner to specific circumstances, i.e. where a partner actually and reasonably incurs

expenses incurred in connection with any threatened, pending or contemplated action,

suit or proceeding, to which the limited partner was or is a party or is threatened to be

made a party, by reason of any acts, omissions or alleged acts or omissions by such

person on behalf of the Partnership.  Adelphia did not execute the guaranty as a limited

partner and did not incur expenses in connection with actual or threatened legal

proceedings.  Rather, Devon maintains, the language of the indemnification agreement

provision shows that it was intended to provide protection for persons who encountered

expenses on account of allegedly wrongful actions taken on behalf of the partnership.

Nor is implied indemnity applicable at this time, because Adelphia has not paid General

Dynamics.  It is Devon's argument that equitable indemnity should also be denied

because Adelphia has not paid General Dynamics, and also, because Adelphia acted

wrongfully in establishing Devon without adequate capital and by its conduct underlying

the deepening insolvency claim, Adelphia is barred from equitable indemnification.

Adelphia Defendants' have responded by filing a motion to amend the Answer to

assert a declaratory judgment action.  Since the Adelphia Defendants have filed a motion

to amend their answer and counter claims to seek declaratory judgment on the indemnity

issue, the Court will consider this portion of the Summary Judgment Motion on March 15, 2006, when oral argument is scheduled to be heard on the Motion to Amend.

## **CONCLUSION**

Adelphia is granted summary judgment on Counts III, IV and V.  Adelphia's motion for summary judgment is denied as to Count II.  Devon's motion for summary judgment is denied in its entirety.  A trial is scheduled to commence on April 17, 2006 with regard to the remaining issues in Count II.  In this regard, the Court will consider, *inter alia*, evidence regarding the characterization of the infusions as equity or intercompany loans; the parties' intent as to the nature of these transfers, whether Devon was left undercapitalized by the Florida Proceed transfers and the feasibility of the sale of certain PCS licenses to fund Devon's operations.

The Court will issue a ruling with regard to summary judgment on the indemnity counterclaims after hearing Adelphia's Motion to Amend its Answer.

Adelphia is directed to submit an order consistent with the memorandum opinion.

Dated:  Poughkeepsie, New York
        March 6, 2006

/s/ CECELIA G. MORRIS
Cecelia G. Morris, U.S.B.J.